**JODI D. THORP**
California Bar No. 223663
427 "C" Street Suite 300
San Diego, California 92101
Telephone: (619) 233-3169 ext. 14
jodithorp@thorplawoffice.com

Counsel for Mr. Cordova

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

**(HONORABLE BARRY TED MOSKOWITZ)**

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | U.S.D.C. No. 07CR3350-BTM |
| Plaintiff, ) | Date: March 28, 2008 |
| v. ) | Time: 2:30 p.m. |
| VICTOR JOAQUIN CORDOVA, ) | |
| Defendant. ) | **STATEMENT OF FACTS AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTIONS** |

## I.

## <u>STATEMENT OF FACTS</u>[1]

On November 11, 2007, a remote video surveillance operator observed people on three ATV's riding in the sand dunes. The three ATV's neared the Trailblazer Mr. Cordova was driving. The ATV passengers got into the Trailblazer, while the ATV drivers continued riding toward Mexico.

Once the passengers were in the Trailblazer, the Trailblazer entered Interstate 8. Agent Vega Torres, who was near the area, began following the Trailblazer. Agent Vega indicated that he used his lights and sirens to pull the trailblazer over. Agent Vega indicated the driver did not yield. According to all three material witnesses, the driver pulled over as soon as they saw the lights and sirens. After they stopped the car,

---

[1] This statement of facts is taken in part from the criminal complaint, indictment, and discovery provided by the government. Mr. Cordova does not adopt all of these facts and reserves the right to challenge these facts at any future proceeding.

1  Mr. Cordova was arrested.  After he was arrested, in response to questioning, he made statements.

2          Mr. Cordova, is charged in an indictment issued by the January 2007 Grand Jury with counts

3  of transporting illegal aliens in violation of 8 U.S.C. § 1324 (a)(1)(A)(ii).  The government alleges that Mr.

4  Cordova was driving a car which contained undocumented people.

5                                              **II.**

6  **THE INDICTMENT SHOULD BE DISMISSED BECAUSE JUDGE BURNS'S INSTRUCTIONS
   AS A WHOLE PROVIDED TO THE JANUARY 2007 GRAND JURY RUN AFOUL OF BOTH**

7  ***NAVARRO-VARGAS* AND *WILLIAMS* AND VIOLATE THE FIFTH AMENDMENT BY
   DEPRIVING Mr. Cordova OF THE TRADITIONAL FUNCTIONING OF THE GRAND JURY[2]**

8  **A.      Introduction.**

9          The indictment in the instant case was returned by the January 2007 grand jury.  That grand jury was

10 instructed by the Honorable Larry A. Burns, United States District Court Judge on January 11, 2007.  See

11 Reporter's Transcript of the Proceedings, dated January 11, 2007, a copy of which is attached hereto as

12 Exhibit A.  Judge Burns's instructions to the impaneled grand jury deviate from the instructions at issue in

13 the major Ninth Circuit cases challenging a form grand jury instruction previously given in this district in

14

15

16 _____

17        [2]Mr. Cordova recognizes that this Court has previously ruled on a motion similar to that
   filed by Mr. Cordova.  See United States v. Martinez-Covarrubias, Case No. 07CR0491-BTM,

18 Order Denying Defendant's Motion to Dismiss the Indictment, dated October 11, 2007.  While
   Mr. Cordova disagrees with this Court's analysis and the determination that the error was not

19 structural, this Court at least recognized that a portion of the instruction is error.  If this Court
   again finds that there was error, but that the error was not structural, this Court must determine

20 whether the error was harmless in this case.  Ms. Cordova asks that this Court order the
   government to produce the transcripts of the grand jury proceedings that resulted in the instant

21 indictment.  The Court may order disclosure of grand jury proceedings "at the request of a
   defendant who shows that a ground may exist to dismiss the indictment because of a matter that

22 occurred before the grand jury."  Fed. R. Crim. P. 6(e)(3)(E)(ii).  The Ninth Circuit requires a
   "particularized need" to justify disclosure, see United States v. Walczak, 785 F.2d 852, 857 (9th

23 Cir. 1986), but that need cannot be any different than the standard set for in Rule 6(e)(3)(E)(ii):
   Mr. Cordova need only show that "a ground *may* exist to dismiss the indictment because of a

24 matter that occurred before the grand jury." Fed. R. Crim. P. 6(e)(3)(E)(ii) (emphasis added).
   That is why the Rule's "general suggestion [is] in favor of disclosure."  See Walczak, 785 F.2d at

25 857.  Here, under this Court's previous approach to Judge Burns' erroneous instruction, it is clear
   that, at the very least, "a ground may exist to dismiss the indictment because of a matter that

26 occurred before the grand jury." Fed. R. Crim. P. 6(e)(3)(E)(ii).

27

28

1  several ways.[3]  These instructions compounded Judge Burns's erroneous instructions and comments to

2  prospective grand jurors during voir dire of the grand jury panel, which immediately preceded the instructions

3  at Ex. A.  See Reporter's Transcript of Proceedings, dated January 11, 2007, a copy of which is attached

4  hereto as Exhibit B.[4]

5        **1.        Judge Burns Instructed Grand Jurors That Their Singular**
                 **Duty Is to Determine Whether or Not Probable Cause Exists**
6                **and That They Have No Right to Decline to Indict When the**
                 **Probable Cause Standard Is Satisfied.**
7

8        After repeatedly emphasizing to the grand jurors that probable cause determination was their sole

9  responsibility, see Ex. A at 3, 3-4, 5,[5] Judge Burns instructed the grand jurors that they were forbidden "from

10 judg[ing] the wisdom of the criminal laws enacted by Congress; that is, whether or not there should be a

11 federal la w or should not be a federal law designating certain activity [as] criminal is not up to you."  See id.

12 at 8.  The instructions go beyond that, however, and tell the grand jurors that, should "you disagree with that

13 judgment made by Congress, then your option is not to say 'well, I'm going to vote against indicting even

14 though I think that the evidence is sufficient' or 'I'm going to vote in favor of even though the evidence may

15 be insufficient.'"  See id. at 8-9.  Thus, the instruction flatly bars the grand jury from declining to indict

16 because the grand jurors disagree with a proposed prosecution.

17       Immediately before limiting the grand jurors' powers in the way just described, Judge Burns referred

18 to an instance in the grand juror selection process in which he excused three potential jurors.  See id. at 8.

19            I've gone over this with a couple of people.  You understood from
             the questions and answers that a couple of people were excused, I
20           think three in this case, because they could not adhere to the
             principle that I'm about to tell you.

21  _____

22       [3]  See, e.g., United States v. Cortez-Rivera, 454 F.3d 1038 (9th Cir. 2006); United States
     v. Navarro-Vargas, 408 F.3d 1184 (9th Cir.) (en banc), cert. denied, 126 S. Ct. 736 (2005)
23   (Navarro-Vargas II); United States v. Navarro-Vargas, 367 F.3d 896 (9th Cir. 2004)(Navarro-
     Vargas I); United States v. Marcucci, 299 F.3d 1156 (9th Cir. 2002) (per curiam).
24

25       [4]  The transcript of the voir dire indicates that grand jurors were shown a video
     presentation on the role of the grand jury.  Mr. Cordova requests that the video presentation be
26   produced.  See United States v. Alter, 482 F.2d 1016, 1029 n.21 (9th Cir. 1973) ("[t]he
     proceedings before the grand jury are secret, but the ground rules by which the grand jury
27   conducts those proceedings are not.").

28       [5]  See also id. at 20 ("You're all about probable cause.").

1   Id.  That "principle" was Judge Burns's discussion of the grand jurors' inability to give effect to their

2   disagreement with Congress.  See id. at 8-9.  Thus, Judge Burns not only instructed the grand jurors on his

3   view of their discretion; he enforced that view on pain of being excused from service as a grand juror.

4           Examination of the voir dire transcript, which contains additional instructions and commentary in

5   the form of the give and take between Judge Burns and various prospective grand jurors, reveals Judge Burns's

6   emphasis on the singular duty to determine whether or not probable cause exists, and his statement that grand

7   jurors cannot judge the wisdom of the criminal laws enacted by Congress merely compounded an erroneous

8   series of instructions already given to the grand jury venire.  In one of his earliest substantive remarks, Judge

9   Burns makes clear that the grand jury's sole function is probable cause determination.

10          [T]he grand jury is determining really two factors: "do we have a
            reasonable belief that a crime was committed?  And second, do we
11          have a reasonable belief that the person that they propose that we
            indict committed the crime?"

12          If the answer is "yes" to both of those, then the case should move
13          forward.  If the answer to either of the questions is "no," then the
            grand jury should not hesitate and not indict.

14

15  See Ex. B at 8.  In this passage, Judge Burns twice uses the term "should" in a context makes clear that the

16  term is employed to convey instruction: "should" cannot reasonably mean optional when it addresses the

17  obligation not to indict when the grand jury has no "reasonable belief that a crime was committed" or if it has

18  no "reasonable belief that the person that they propose that we indict committed the crime."

19          Equally revealing are Judge Burns's interactions with two potential grand jurors who indicated that,

20  in some unknown set of circumstances, they might decline to indict even where there was probable cause.

21  Because of the redactions of the grand jurors' names, Mr. Cordova will refer to them by occupation.  One is

22  a retired clinical social worker (CSW), and the other is a real estate agent (REA).  The CSW indicated a view

23  that no drugs should be considered illegal and that some drug prosecutions were not an effective use of

24  resources.  See id. at 16.  The CSW was also troubled by certain unspecified immigration cases.  See id.

25          Judge Burns made no effort to determine what sorts of drug and immigration cases troubled the

26  CSW.  He never inquired as to whether the CSW was at all troubled by the sorts of cases actually filed in this

27  district, such as drug smuggling cases and cases involving reentry after deportation and alien smuggling.

28  Rather, he provided instructions suggesting that, in any event, any scruples CSW may have possessed were

1  simply not capable of expression in the context of grand jury service.

2            Now, the question is can you fairly evaluate [drug cases and
3            immigration cases]?  Just as the defendant is ultimately entitled to
             a fair trial and the person that's accused is entitled to a fair appraisal
4            of the evidence of the case that's in front of you, so, too, is the
             United States entitled to a fair judgment.  If there's probable cause,
5            then the case should go forward.  *I wouldn't want you to say*, "well,
             yeah, there's probable cause, but I still don't like what our
6            government is doing.  I disagree with these laws, so I'm not going
             to vote for it to go forward."  If that is your frame of mind, the
             probably you shouldn't serve.  Only you can tell me that.

7

8  See id. at 16-17 (emphasis added).  Thus, without any sort of context whatsoever, Judge Burns let the grand

9  juror know that he would not want him or her to decline to indict in an individual case where the grand juror

10  "[didn't] like what our government is doing," see id. at 17, but in which there was probable cause.  See id.

11  Such a case "should go forward."  See id.  Given that blanket proscription on grand juror discretion, made

12  manifest by Judge Burns's use of the pronoun "I", the CSW indicated that it "would be difficult to support

13  a charge even if [the CSW] thought the evidence warranted it."  See id.  Again, Judge Burns's question

14  provided no context; he inquired regarding "a case," a term presumably just as applicable to possession of a

15  small amount of medical marijuana as kilogram quantities of methamphetamine for distribution.  Any grand

16  juror listening to this exchange could only conclude that there was *no* case in which Judge Burns would permit

17  them to vote "no bill" in the face of a showing probable cause.

18       Just in case there may have been a grand juror that did not understand his or her inability to exercise

19  anything like prosecutorial discretion, Judge Burns drove the point home in his exchange with REA.  REA

20  first advised Judge Burns of a concern regarding the "disparity between state and federal law" regarding

21  "medical marijuana."  See id. at 24.  Judge Burns first sought to address REA's concerns about medical

22  marijuana by stating that grand jurors, like trial jurors, are simply forbidden from taking penalty

23  considerations into account.

24            Well, those things -- the consequences of your determination
             shouldn't concern you in the sense that penalties or punishment,
25            things like that -- we tell trial jurors, of course, that they cannot
             consider the punishment or the consequence that Congress has set
26            for these things.  We'd ask you to also abide by that.  We want you
             to make a business-like decision of whether there was a probable
27            cause. . . .

28  Id. at 24-25.  Having stated that REA was to "abide" by the instruction given to trial jurors, Judge Burns went

1  on to suggest that REA recuse him or herself from medical marijuana cases.  See id. at 25.

2      In response to further questioning, REA disclosed REA's belief "that drugs should be legal." See id.

3  That disclosure prompted Judge Burns to begin a discussion that ultimately led to an instruction that a grand

4  juror is obligated to vote to indict if there is probable cause.

5          I can tell you sometimes I don't agree with some of the legal
decisions that are indicated that I have to make.  But my alternative

6          is to vote for someone different, vote for someone that supports the
policies I support and get the law changed.  It's not for me to say,

7          "well, I don't like it.  So I'm not going to follow it here."

8          You'd have a similar obligation as a grand juror even though you
might have to grit your teeth on some cases.  Philosophically, if you

9          were a member of congress, you'd vote against, for example,
criminalizing marijuana.  I don't know if that's it, but you'd vote

10          against criminalizing some drugs.

11          That's not what your prerogative is here.  You're prerogative instead
is to act like a judge and say, "all right.  This is what I've to deal

12          with objectively.  Does it seem to me that a crime was committed?
Yes.  Does it seem to me that this person's involved?  It does." *And*

13          *then your obligation, if you find those to be true, would be to vote
in favor of the case going forward.*

14  Id. at 26-27 (emphasis added).  Thus, the grand juror's duty is to conduct a simple two part test, which, if both

15  questions are answered in the affirmative, lead to an "obligation" to indict.

16      Having set forth the duty to indict, and being advised that REA was "uncomfortable" with that

17  paradigm, Judge Burns then set about to ensure that there was no chance of a deviation from the obligation

18  to indict in every case in which there was probable cause.

19          The Court: Do you think you'd be inclined to let people go in drug
cases even though you were convinced there was probable cause

20          they committed a drug offense?
REA: It would depend on the case.

21          The Court: Is there a chance that you would do that?
REA: Yes.

22          The Court: I appreciate your answers.  I'll excuse you at this time.

23

24  Id. at 27.  Two aspects of this exchange are crucial.  First, REA plainly does not intend to act solely on his

25  political belief in decriminalization -- whether he or she would indict "depend[s] on the case," see id., as it

26  should.  Because REA's vote "depend[s] on the case," see id., it is necessarily true that REA would vote to

27  indict in some (perhaps many or even nearly all) cases in which there was probable cause.  Again, Judge Burns

28  made no effort to explore REA's views; he did not ascertain what sorts of cases would prompt REA to

1  hesitate.  The message is clear: it does not matter what type of case might prompt REA's reluctance to indict

2  because, once the two part test is satisfied, the "obligation" is "to vote in favor of the case going forward."[6]

3  See id. at 27.  That is why even the "chance," see id., that a grand juror might not vote to indict was too great

4  a risk to run.

5      **2.      The Instructions Posit a Non-Existent Prosecutorial Duty to Offer Exculpatory Evidence.**

6

7      In addition to his instructions on the authority to choose not to indict, Judge Burns also assured the

8  grand jurors that prosecutors would present to them evidence that tended to undercut probable cause.  See Ex.

9  A at 20.[7]

10  _____

11      [6] This point is underscored by Judge Burns's explanation to the Grand Jury that a
    magistrate judge will have determined the existence of probable cause "in most circumstances"
12  before it has been presented with any evidence.  See Ex. A at 6.  This instruction created an
    imprimatur of finding probable cause in each case because had a magistrate judge not so found,
13  the case likely would not have been presented to the Grand Jury for indictment at all.  The Grand
    Jury was informed that it merely was redundant to the magistrate court "in most circumstances."
14  See id.  This instruction made the grand jury more inclined to indict irrespective of the evidence
15  presented.

16      [7] These instructions were provided in the midst of several comments that praised the
    United States attorney's office and prosecutors in general.  Judge Burns advised the grand jurors
17  that they "can expect that the U.S. Attorneys that will appear in from of [them] will be candid,
    they'll be honest, and . . . they'll act in good faith in all matters presented to you."  See Ex. A at
18  27.  The instructions delivered during voir dire go even further.  In addressing a prospective
    grand juror who revealed "a strong bias for the U.S. Attorney, whatever cases they might bring,"
19  see Ex. B at 38, Judge Burns affirmatively endorsed the prospective juror's view of the U.S.
    Attorney's office, even while purporting to discourage it: "frankly, I agree with the things you are
20  saying.  They make sense to me."  See id. at 43.  See also id. at 40 ("You were saying that you
    give a presumption of good faith to the U.S. Attorney and assume, quite logically, that they're
21  not about the business of trying to indict innocent people or people that they believe to be
22  innocent or the evidence doesn't substantiate the charges against.").
    Judge Burns's discussion of his once having been a prosecutor before the Grand Jury
23  compounded the error inherent in his praising of the government attorneys.  See Ex. A at 9-10.
24  Judge Burns's instructions implied that as a prior prosecutor and current "jury liaison judge," see
    id. at 8, he would not allow the government attorneys to act inappropriately or to present cases
25  for indictment where no probable cause existed.
26      In addition, while Judge Burns instructed the Grand Jury that it had the power to question
    witnesses, Judge Burns's instructions also told the Grand Jury that it should "be deferential to the
27  U.S. Attorney if there is an instance where the U.S. Attorney thinks a question ought not to be
    asked."  See Ex. A at 12.  As the dissent in Navarro-Vargas pointed out, "the grand jury's
28  independence is diluted by [such an] instruction, which encourages deference to prosecutors."

Now, again, this emphasizes the difference between the function of the grand jury and the trial jury. You're all about probable cause. If you think that there's evidence out there that might cause you to say "well, I don't think probable cause exists," then it's incumbent upon you to hear that evidence as well. As I told you, in most instances, *the U.S. Attorneys are duty-bound to present evidence that cuts against what they may be asking you to do if they're aware of that evidence.*

Id. (emphasis added).

The antecedent to this instruction is also found in the voir dire. After advising the grand jurors that "the presentation of evidence to the grand jury is necessarily one-sided," see Ex. B at 14, Judge Burns gratuitously added that "[his] experience is that the prosecutors don't play hide-the-ball. If there's something adverse or that cuts against the charge, you'll be informed of that. They have a duty to do that." See id. Thus, Judge Burns unequivocally advised the grand jurors that the government would present any evidence that was "adverse" or "that cuts against the charge." See id.

**B.    Navarro-Vargas Establishes Limits on the Ability of Judges to Constrain the Powers of the Grand Jury, Which Judge Burns Far Exceeded in His Instructions as a Whole During Impanelment.**

The Ninth Circuit has, over vigorous dissents, rejected challenges to various instructions given to grand jurors in the Southern District of California. See Navarro-Vargas II, 408 F.3d 1184. While the Ninth Circuit has thus far (narrowly) rejected such challenges, it has, in the course of adopting a highly formalistic approach[8] to the problems posed by the instructions, endorsed many of the substantive arguments raised by the defendants in those cases. The district court's instructions cannot be reconciled with the role of the grand jury as set forth in Navarro-Vargas II. Taken together, the voir dire of and instructions given to the January 2007 Grand Jury, go far beyond those at issue in Navarro-Vargas, taking a giant leap in the direction of a bureaucratic, deferential grand jury, focused solely upon probable cause determinations and utterly unable to

---

Navarro-Vargas, 408 F.3d at 1215. The judge's admonition that his statement was only "advice," see Ex A at 12, does not cure the error as courts regularly presume grand jurors follow instructions provided to them by the court. See id. at 1202, n.23 ("We must presume that grand jurors will follow instructions because, in fact, we are prohibited from examining jurors to verify whether they understood the instruction as given and then followed it.").

[8]  See Navarro-Vargas II, 408 F.3d at 1210-11 (Hawkins, J., dissenting) (criticizing the majority because "[t]he instruction's use of the word 'should' is most likely to be understood as imposing an inflexible 'duty or obligation' on grand jurors, and thus to circumscribe the grand jury's constitutional independence.").

1  exercise any quasi-prosecutorial discretion.  That is not the institution the Framers envisioned.  See United

2  States v. Williams, 504 U.S. 36, 49 (1992).

3          For instance, with respect to the grand jury's relationship with the prosecution, the Navarro-Vargas

4  II majority acknowledges that the two institutions perform similar functions: "'the public prosecutor, in

5  deciding whether a particular prosecution shall be instituted or followed up, performs much the same function

6  as a grand jury.'"  Navarro-Vargas II, 408 F.3d at 1200 (quoting Butz v. Economou, 438 U.S. 478, 510

7  (1978)).  Accord United States v. Navarro-Vargas, 367 F.3d 896, 900 (9th Cir. 2004) (Navarro-Vargas

8  I)(Kozinski, J., dissenting) (The grand jury's discretion in this regard "is most accurately described as

9  prosecutorial.").  See also Navarro-Vargas II, 408 F.3d at 1213 (Hawkins, J., dissenting).  It recognizes that

10  the prosecutor is not obligated to proceed on any indictment or presentment returned by a grand jury, id., but

11  also that "the grand jury has no obligation to prepare a presentment or to return an indictment drafted by the

12  prosecutor."  Id.  See Niki Kuckes, The Democratic Prosecutor: Explaining the Constitutional Function of

13  the Federal Grand Jury, 94 Geo. L.J. 1265, 1302 (2006) (the grand jury's discretion not to indict was

14  "'arguably . . . the most important attribute of grand jury review from the perspective of those who insisted

15  that a grand jury clause be included in the Bill of Rights'") (quoting Wayne LaFave et al., Criminal Procedure

16  § 15.2(g) (2d ed. 1999)).

17          Indeed, the Navarro-Vargas II majority agrees that the grand jury possesses all the attributes set forth

18  in Vasquez v. Hillery, 474 U.S. 254 (1986).  See id.

19              The grand jury thus determines not only whether probable cause
                exists, but also whether to "charge a greater offense or a lesser
20              offense; numerous counts or a single count; and perhaps most
                significant of all, a capital offense or a non-capital offense -- all on
21              the basis of the same facts.  And, significantly, the grand jury may
                refuse to return an indictment even "'where a conviction can be
22              obtained.'"

23  Id. (quoting Vasquez, 474 U.S. at 263).  The Supreme Court has itself reaffirmed Vasquez's description of

24  the grand jury's attributes in Campbell v. Louisiana, 523 U.S. 392 (1998), noting that the grand jury "controls

25  not only the initial decision to indict, but also significant questions such as how many counts to charge and

26  whether to charge a greater or lesser offense, including the important decision whether to charge a capital

27  crime."  Id. at 399 (citing Vasquez, 474 U.S. at 263).  Judge Hawkins notes that the Navarro-Vargas II

28  majority accepts the major premise of Vasquez: "the majority agrees that a grand jury has the power to refuse

1 to indict someone even when the prosecutor has established probable cause that this individual has committed

2 a crime." <u>See id.</u> at 1214 (Hawkins, J. dissenting). <u>Accord</u> <u>Navarro-Vargas I</u>, 367 F.3d at 899 (Kozinski, J.,

3 dissenting); <u>United States v. Marcucci</u>, 299 F.3d 1156, 1166-73 (9th Cir. 2002) (per curiam) (Hawkins, J.,

4 dissenting). In short, the grand jurors' prerogative not to indict enjoys strong support in the Ninth Circuit.

5 But not in Judge Burns's instructions.

6 **C.** **Judge Burns's Instructions Forbid the Exercise of Grand Jury Discretion Established in Both *Vasquez* and *Navarro-Vargas II*.**

7

8 The <u>Navarro-Vargas II</u> majority found that the instruction in that case "leave[s] room for the grand

9 jury to dismiss even if it finds probable cause," 408 F.3d at 1205, adopting the analysis in its previous decision

10 in <u>Marcucci</u>. <u>Marcucci</u> reasoned that the instructions do not mandate that grand jurors indict upon every

11 finding of probable cause because the term "should" may mean "what is probable or expected." 299 F.3d at

12 1164 (citation omitted). That reading of the term "should" makes no sense in context, as Judge Hawkins ably

13 pointed out. <u>See</u> <u>Navarro-Vargas II</u>, 408 F.3d at 1210-11 (Hawkins, J., dissenting) ("The instruction's use

14 of the word 'should' is most likely to be understood as imposing an inflexible 'duty or obligation' on grand

15 jurors, and thus to circumscribe the grand jury's constitutional independence."). <u>See also</u> <u>id.</u> ("The 'word'

16 should is used to express a duty [or] obligation.") (quoting <u>The Oxford American Diction and Language Guide</u>

17 1579 (1999) (brackets in original)).

18 The debate about what the word "should" means is irrelevant here; the instructions here make no

19 such fine distinction. The grand jury instructions make it painfully clear that grand jurors simply may not

20 choose not to indict in the event of what appears to them to be an unfair application of the law: should "you

21 disagree with that judgment made by Congress, then your option is not to say 'well, I'm going to vote against

22 indicting even though I think that the evidence is sufficient'...." <u>See</u> Ex. A at 8-9. Thus, the instruction flatly

23 bars the grand jury from declining to indict because they disagree with a proposed prosecution. No grand juror

24 would read this language as instructing, or even allowing, him or her to assess "the need to indict." <u>Vasquez</u>,

25 474 U.S. at 264.

26 While Judge Burns used the word "should" instead of "shall" during voir dire with respect to whether

27 an indictment was required if probable cause existed, <u>see</u> Ex. B at 4, 8, n context, it is clear that he could only

28 mean "should" in the obligatory sense. For example, when addressing a prospective juror, Judge Burns not

1  only told the jurors that they "should" indict if there is probable cause, he told them that if there is not

2  probable cause, "then the grand jury should hesitate and not indict."  See id. at 8.  At least in context, it would

3  strain credulity to suggest that Judge Burns was using "should" for the purpose of "leaving room for the grand

4  jury to [indict] if it finds [no] probable cause."  See Navarro-Vargas, 408 F.3d at 1205.  Clearly he was not.

5        The full passage cited above effectively eliminates any possibility that Judge Burns intended the

6  Navarro-Vargas spin on the word "should."

7              [T]he grand jury is determining really two factors: "do we have a
             reasonable belief that a crime was committed?  And second, do we
8            have a reasonable belief that the person that they propose that we
             indict committed the crime?"

9
             If the answer is "yes" to both of those, then the case should move
10           forward.  If the answer to either of the questions is "no," then the
             grand jury should not hesitate and not indict.

11
12  See Ex. B at 8.  Of the two sentences containing the word 'should," the latter of the two essentially states that

13  if there is no probable cause, you *should* not indict.  Judge Burns could not possibly have intended to "leav[e]

14  room for the grand jury to [indict] even if it finds [no] probable cause."  See Navarro-Vargas, 408 F.3d at

15  1205 (citing Marcucci, 299 F.3d at 1159).  That would contravene the grand jury's historic role of protecting

16  the innocent.  See, e.g., United States v. Calandra, 414 U.S. 338, 343 (1974) (The grand jury's

17  "responsibilities continue to include both the determination whether there is probable cause and the protection

18  of citizens against unfounded criminal prosecutions.") (citation omitted).

19        By the same token, if Judge Burns said that "the case should move forward" if there is probable

20  cause, but intended to "leav[e] room for the grand jury to dismiss even if it finds probable cause," see

21  Navarro-Vargas, 408 F.3d at 1205 (citing Marcucci, 299 F.3d at 1159), then he would have to have intended

22  two different meanings of the word "should" in the space of two consecutive sentences.  That could not have

23  been his intent.  But even if it were, no grand jury could ever have had that understanding.[9]  Jurors are not

24  presumed to be capable of sorting through internally contradictory instructions.  See generally United States

25  v. Lewis, 67 F.3d 225, 234 (9th Cir. 1995) ("where two instructions conflict, a reviewing court cannot

26

27        [9]  This argument does not turn on Mr. Cordova's view that the Navarro-Vargas/Marcucci
     reading of the word "should" in the model instructions is wildly implausible.  Rather, it turns on
28   the context in which the word is employed by Judge Burns in his unique instructions, context
     which eliminates the Navarro-Vargas/Marcucci reading as a possibility.

1  presume that the jury followed the correct one") (citation, internal quotations and brackets omitted).

2      Lest there be any room for ambiguity, on no less than four occasions, Judge Burns made it explicitly

3  clear to the grand jurors that "should" was not merely suggestive, but obligatory:

4      (1)      The first occasion occurred in the following exchange when Judge Burns conducted voir

5  dire and excused a potential juror (CSW):

6          The Court: . . . If there's probable cause, then the case should go
           forward. I wouldn't want you to say, "Well, yeah, there's probable
7          cause. But I still don't like what the government is doing. I
           disagree with these laws, so I'm not going to vote for it to go
8          forward." If that's your frame of mind, then probably you shouldn't
           serve. Only you can tell me that.
9          Prospective Juror: Well, I think I may fall in that category.
           The Court: In the latter category?
10         Prospective Juror: Yes.
           The Court: Where it would be difficult for you to support a charge
11         even if                you thought the evidence warranted it?
           Prospective Juror: Yes.
12         The Court: I'm going to excuse you then.

13  See Ex. B at 17. There was nothing ambiguous about the word "should" in this exchange with a prospective

14  juror. Even if the prospective juror did not like what the government was doing in a particular case, that case

15  "should go forward" and Judge Burns expressly disapproved of any vote that might prevent that. See id. ("I

16  wouldn't want you [to vote against such a case]"). The sanction for the possibility of independent judgment

17  was dismissal, a result that provided full deterrence of that juror's discretion and secondary deterrence as to

18  the exercise of discretion by any other prospective grand juror.

19      (2)      In an even more explicit example of what "should" meant, Judge Burns makes clear that

20  it there is an unbending obligation to indict if there is probable cause. Grand jurors have no other prerogative.

21  Court   . . . It's not for me to say, "Well, I don't like it. So I'm not going to follow it here."

22         You'd have a similar *obligation* as a grand juror even though you
           might have to grit your teeth on some cases. Philosophically, if you
23         were a member of Congress, you'd vote against, for example,
           criminalizing marijuana. I don't know if that's it, but you'd vote
24         against criminalizing some drugs.

25         That's not what your *prerogative* is here. Your prerogative instead
           is act like a judge and to say, "All right. This is what I've got to deal
26         with objectively. Does it seem to me that a crime was committed?
           Yes. Does it seem to me that this person's involved? It does." *And*
27         *then your obligation, if you find those things to be true, would be to*
           *vote in favor of the case going forward.*

28

12                                  07CR3350-BTM

1  Id. at 26-27 (emphasis added). After telling this potential juror (REA) what his obligations and prerogatives

2  were, the Court inquired as to whether "you'd be inclined to let people go on drug cases even though you were

3  convinced there was probable cause they committed a drug offense?" Id. at 27. The potential juror responded:

4  "It would depend on the case." Id. Nevertheless, that juror was excused. Id. at 28. Again, in this context, and

5  contrary to the situation in Navarro-Vargas, "should" means "shall"; it is obligatory, and the juror has no

6  prerogative to do anything other than indict if there is probable cause.

7       Moreover, as this example demonstrates, the issue is not limited to whether the grand jury believes

8  a particular law to be "unwise." This juror said that any decision to indict would not depend on the law, but

9  rather it would "depend on the case." Thus, it is clear that Judge Burns's point was that if a juror could not

10  indict on probable cause for *every* case, then that juror was not fit for service. It is equally clear that the

11  prospective juror did not dispute the "wisdom of the law;" he was prepared to indict under some factual

12  scenarios, perhaps many. But Judge Burns did not pursue the question of what factual scenarios troubled the

13  prospective jurors, because his message is that there is no discretion not to indict.

14       (3)      As if the preceding examples were not enough, Judge Burns continued to pound the point

15  home that "should" meant "shall" when he told another grand juror during voir dire: "[W]hat I have to insist

16  on is that you follow the law that's given to us by the United States Congress. We enforce the federal laws

17  here." See id. at 61.

18       (4)      And then again, after swearing in all the grand jurors who had already agreed to indict

19  in every case where there was probable cause, Judge Burns reiterated that "should" means "shall" when he

20  reminded them that "your option is not to say 'well, I'm going to vote against indicting even though I think

21  that the evidence is sufficient' . . . . Instead your *obligation* is . . . not to bring your personal definition of what

22  the law ought to be and try to impose that through applying it in a grand jury setting." See Ex. A at 9.

23       Moreover, Judge Burns advised the grand jurors that the were forbidden from considering the

24  penalties to which indicted persons may be subject.

25                    Prospective Juror (REA): ... And as far as being fair, it kind of
                      depends on what the case is about because there is a disparity
26                    between state and federal law.
                      The Court: In what regard?
27                    Prospective Juror: Specifically, medical marijuana.
                      The Court:  Well, those things -- the consequences of your
28                    determination shouldn't concern you in the sense that penalties or

1    punishment, things like that -- *we tell trial jurors, of course, that*
     *they cannot consider the punishment or the consequence that*
2    *Congress has set for these things. We'd ask you to also abide by*
     *that.* We want you to make a business-like decision of whether
3    there was a probable cause. ...

4    See Ex. B at 24-25 (emphasis added). A "business-like decision of whether there was a probable cause"

5    would obviously leave no role for the consideration of penalty information.

6         The Ninth Circuit previously rejected a claim based upon the proscription against consideration of

7    penalty information based upon the same unlikely reading of the word "should" employed in Marcucci. See

8    United States v. Cortez-Rivera, 454 F.3d 1038, 1040-41 (9th Cir. 2006). Cortez-Rivera is inapposite for two

9    reasons. First, Judge Burns did not use the term "should" in the passage quoted above. Second, that context,

10   as well as his consistent use of a mandatory meaning in employing the term, eliminate the ambiguity (if there

11   ever was any) relied upon by Cortez-Rivera. The instructions again violate Vasquez, which plainly authorized

12   consideration of penalty information. See 474 U.S. at 263.

13        Nothing can mask the undeniable fact that Judge Burns explicitly instructed the jurors time and time

14   again that they had a duty, an obligation, and a singular prerogative to indict each and every case where there

15   was probable cause. These instructions go far beyond the holding of Navarro-Vargas and stand in direct

16   contradiction of the Supreme Court's decision in Vasquez. Indeed, it defies credulity to suggest that a grand

17   juror hearing these instructions, and that voir dire, could possibly believe what the Court held in Vasquez:

18        The grand jury does not determine only that probable cause exists
          to believe that a defendant committed a crime, or that it does not.
19        In the hands of the grand jury lies the power to charge a greater
          offense or a lesser offense; numerous counts or a single count; and
20        perhaps most significant of all, a capital offense or a non-capital
          offense – all on the basis of the same facts. Moreover, "[t]he grand
21        jury is not bound to indict in every case where a conviction can be
          obtained."
22
23   474 U.S. at 263 (quoting United States v. Ciambrone, 601 F.2d 616, 629 (2nd Cir. 1979) (Friendly, J.,

     dissenting)); accord Campbell v. Louisiana, 523 U.S. 392, 399 (1998) (The grand jury "controls not only the
24
     initial decision to indict, but also significant decisions such as how many counts to charge and whether to
25
     charge a greater or lesser offense, including the important decision whether to charge a capital crime."). Nor
26
     would the January 2007 grand jury ever believe that it was empowered to assess the "the need to indict." See
27
     id. at 264. Judge Burns's grand jury is not Vasquez's grand jury. The instructions therefore represent
28

1  structural constitutional error "that interferes with the grand jury's independence and the integrity of the grand
2  jury proceeding." See United States v. Isgro, 974 F.2d 1091, 1094 (9th Cir. 1992). The indictment must
3  therefore be dismissed. Id.

4      The Navarro-Vargas II majority's faith in the structure of the grand jury *is not* a cure for the
5  instructions' excesses. The Navarro-Vargas II majority attributes "[t]he grand jury's discretion -- its
6  independence -- [to] the absolute secrecy of its deliberations and vote and the unreviewability of its
7  decisions." 408 F.3d at 1200. As a result, the majority discounts the effect that a judge's instructions may
8  have on a grand jury because "it is the *structure* of the grand jury process and its *function* that make it
9  independent." Id. at 1202 (emphases in the original).

10     Judge Hawkins sharply criticized this approach. The majority, he explains, "believes that the
11  'structure' and 'function' of the grand jury -- particularly the secrecy of the proceedings and unreviewability
12  of many of its decisions -- sufficiently protects that power." See id. at 1214 (Hawkins, J., dissenting). The
13  flaw in the majority's analysis is that "[i]nstructing a grand jury that it lacks power to do anything beyond
14  making a probable cause determination ... unconstitutionally undermines the very structural protections that
15  the majority believes save[] the instruction." Id. After all, it is an "'almost invariable assumption of the law
16  that jurors follow their instructions.'" Id. (quoting Richardson v. Marsh, 481 U.S. 200, 206 (1987)). If that
17  "invariable assumption" were to hold true, then the grand jurors could not possibly fulfill the role described
18  in Vasquez. Indeed, "there is something supremely cynical about saying that it is fine to give jurors erroneous
19  instructions because nothing will happen if they disobey them." Id.

20     In setting forth Judge Hawkins' views, Mr. Cordova understands that this Court may not adopt them
21  solely because the reasoning that supports them is so much more persuasive than the majority's sophistry.
22  Rather, she sets them forth to urge the Court *not to extend* what is already untenable reasoning.

23     Here, again, the question is not an obscure interpretation of the word "should", especially in light
24  of the instructions and commentary by Judge Burns during voir dire discussed above - unaccounted for by the
25  Court in Navarro-Vargas II because they had not yet been disclosed to the defense, but an absolute ban on the
26  right to refuse to indict that directly conflicts with the recognition of that right in Vasquez, Campbell, and both
27  Navarro-Vargas II opinions. Navarro-Vargas II is distinguishable on that basis, but not only that.

28     Judge Burns did not limit himself to denying the grand jurors the power that Vasquez plainly states

they enjoy.  He also excused prospective grand jurors who might have exercised that Fifth Amendment prerogative, excusing "three [jurors] in this case, because they could not adhere to [that] principle...."  See Ex. A at 8; Ex. B at 17, 28.  The structure of the grand jury and the secrecy of its deliberations cannot embolden grand jurors who are no longer there, likely because they expressed their willingness to act as the conscience of the community.  See Navarro-Vargas II, 408 F.3d at 1210-11 (Hawkins, J., dissenting) (a grand jury exercising its powers under Vasquez "serves ... to protect the accused from the other branches of government by acting as the 'conscience of the community.'") (quoting Gaither v. United States, 413 F.2d 1061, 1066 & n.6 (D.C. Cir. 1969)).  The federal courts possess only "very limited" power "to fashion, on their own initiative, rules of grand jury procedure," United States v. Williams, 504 U.S. 36, 50 (1992), and, here, Judge Burns has both fashioned his own rules and enforced them.

**D.    The Instructions Conflict with <u>Williams</u>' Holding That There Is No Duty to Present Exculpatory Evidence to the Grand Jury.**

In Williams, the defendant, although conceding that it was not required by the Fifth Amendment, argued that the federal courts should exercise their supervisory power to order prosecutors to disclose exculpatory evidence to grand jurors, or, perhaps, to find such disclosure required by Fifth Amendment common law.  See 504 U.S. at 45, 51.  Williams held that "as a general matter at least, no such 'supervisory' judicial authority exists."  See id. at 47.  Indeed, although the supervisory power may provide the authority "to dismiss an indictment because of misconduct before the grand jury, at least where that misconduct amounts to a violation of one of those 'few, clear rules which were carefully drafted and approved by this Court and by Congress to ensure the integrity of the grand jury's functions,'" id. at 46 (citation omitted), it does not serve as "a means of *prescribing* such standards of prosecutorial conduct in the first instance."  Id. at 47 (emphasis added).  The federal courts possess only "very limited" power "to fashion, on their own initiative, rules of grand jury procedure."  Id. at 50.  As a consequence, Williams rejected the defendant's claim, both as an exercise of supervisory power and as Fifth Amendment common law.  See id. at 51-55.

Despite the holding in Williams, the instructions here assure the grand jurors that prosecutors would present to them evidence that tended to undercut probable cause.  See Ex. A at 20.

> Now, again, this emphasizes the difference between the function of the grand jury and the trial jury.  You're all about probable cause. If you think that there's evidence out there that might cause you say "well, I don't think probable cause exists," then it's incumbent upon

> you to hear that evidence as well. As I told you, in most instances, *the U.S. Attorneys are duty-bound to present evidence that cuts against what they may be asking you to do if they're aware of that evidence.*

Id. (emphasis added). Moreover, the district court later returned to the notion of the prosecutors and their duties, advising the grand jurors that they "can expect that the U.S. Attorneys that will appear in from of [them] will be candid, they'll be honest, and ... they'll act in good faith in all matters presented to you." See id. at 27. The Ninth Circuit has already concluded it is likely this final comment is "unnecessary." See Navarro-Vargas, 408 F.3d at 1207.

This particular instruction has a devastating effect on the grand jury's protective powers, particularly if it is not true. It begins by emphasizing the message that Navarro-Vargas II somehow concluded was not conveyed by the previous instruction: "You're all about probable cause." See Ex. A at 20. Thus, once again, the grand jury is reminded that they are limited to probable cause determinations (a reminder that was probably unnecessary in light of the fact that Judge Burns had already told the grand jurors that they likely would be excused if they rejected this limitation). The instruction goes on to tell the grand jurors that they should consider evidence that undercuts probable cause, but also advises the grand jurors that the prosecutor will present it. The end result, then, is that grand jurors should consider evidence that goes against probable cause, but, if none is presented by the government, they can presume that there is none. After all, "in most instances, the U.S. Attorneys are duty-bound to present evidence that cuts against what they may be asking you to do if they're aware of that evidence." See id. Moreover, during voir dire, Judge Burns informed the jurors that "my experience is that the prosecutors don't play hide-the-ball. If there's something adverse or that cuts against the charge, you'll be informed of that. *They have a duty to do that.*" See Ex. B at 14-15 (emphasis added). Thus, if the exculpatory evidence existed, it necessarily would have been presented by the "duty-bound" prosecutor, because the grand jurors "can expect that the U.S. Attorneys that will appear in from of [them] will be candid, they'll be honest, and ... they'll act in good faith in all matters presented to you." See Ex. A at 27.

These instructions create a presumption that, in cases where the prosecutor does not present exculpatory evidence, no exculpatory evidence exists. A grand juror's reasoning, in a case in which no exculpatory evidence was presented, would proceed along these lines:

(1)    I have to consider evidence that undercuts probable cause.

(2)    The candid, honest, duty-bound prosecutor would, in good faith, have presented any such evidence to me, if it existed.

(3)    Because no such evidence was presented to me, I may conclude that there is none. Even if some exculpatory evidence were presented, a grand juror would necessarily presume that the evidence presented represents the universe of all available exculpatory evidence; if there was more, the duty-bound prosecutor would have presented it.

The instructions, therefore, discourage investigation -- if exculpatory evidence were out there, the prosecutor would present it, so investigation is a waste of time -- and provide additional support to every probable cause determination: i.e., this case may be weak, but I know that there is nothing on the other side of the equation because it was not presented. A grand jury so badly misguided is no grand jury at all under the Fifth Amendment.

## III.

## MOTION TO SUPPRESS EVIDENCE UNDER THE FOURTH AMENDMENT

The Fourth Amendment of the United States Constitution guarantees the right of people to be secure in their persons, houses, papers and effects against unreasonable searches and seizures. U.S. Const. Amend. IV. The Fourth Amendment proscribes "unreasonable searches and seizures." U.S. Const., amend IV. Temporary detention of individuals during the stop of an automobile, even if only for a brief period and for a limited purpose, constitutes a "seizure" within the meaning of the Fourth Amendment, and must be supported by at least reasonable suspicion. See Delaware v. Prouse, 440 U.S. 648, 653 (1979); United States v. Martinez-Fuerte, 428 U.S. 543, 556 (1976). Reasonable suspicion requires that the officer making the stop be "aware of specific, articulable facts which, when considered with objective and reasonable inferences, form a basis for *particularized* suspicion." United States v. Montero-Camargo, 208 F.3d 1122, 1129 (9th Cir. 2000) (en banc) (emphasis added).

The Fourth Amendment protection from unreasonable searches and seizures applies to persons in moving vehicles. See United States v. Cortez, 449 U.S. 411, 417 (1981). These protections also apply to persons driving near the United States' border with Mexico. Roving border patrol agents must have reasonable suspicion, based on specific and articulable facts, in order to initiate a stop. United States v.

1  Brignoni-Ponce, 422 U.S. 873, 884 (1975); Gonzalez-Rivera v. I.N.S., 22 F.3d 1441, 1445 (1994).

2  "Reasonable suspicion requires that the specific facts and inferences create suspicion 'that the particular

3  person detained is engaged in criminal activity.'" United States v. Rodriguez-Sanchez, 23 F.3d 1488, 1493

4  (9th Cir. 1994). Simply put, an officer must have a *particularized and objective basis of criminal activity* in

5  order to detain a motorist. Cortez, 449 U.S. at 417-418. "Founded suspicion must exist at the time the officer

6  initiates the stop." United States v. Salinas, 940 F.2d 392, 394 (9th Cir. 1991) (citations omitted).

7        Because the Border Patrol agent or agents who initiated and performed the stop in this case did not

8  have the requisite suspicion that the Constitution demands, the stop of Mr. Cordova violated his Fourth

9  Amendment rights. Mr. Cordova believes the agents relied on the fact that there were passengers on ATV's

10  who entered the Trailblazer. The agents may also try to rely on the fact that the remote surveillance operator

11  believed the ATV's, after dropping off the passengers, drove in the direction toward Mexico. Although Mr.

12  Cordova does not agree with this fact, even if true, it does not equate to reasonable suspicion in this case. The

13  ATV's and Trailblazer were driving in an area commonly used by recreational vehicles. In addition, it was

14  November, which is the high season for recreational vehicle tourism in that area. There are not any

15  particularized facts that suggest that Mr. Cordova was engaged in criminal activity.

16        On November 11, 2007, government agents seized Mr. Cordova in violation of the Fourth

17  Amendment. Agents lacked reasonable suspicion and probable cause to seize Mr. Cordova. For these

18  reasons, Mr. Cordova moves to suppress all evidence, including but not limited to his statements, the

19  statements of all material witnesses in the car, any observations made by the agents, and anything discovered

20  as a result of his unlawful seizure. In the alternative, Mr. Cordova requests an evidentiary hearing on this

21  Fourth Amendment motion.

22        **2.**      **The government bears the burden of justifying this warrantless seizure**

23        Agents seized Mr. Cordova without a warrant. That seizure is therefore presumptively unreasonable.

24  See United States v. Hawkins, 249 F.3d 867, 872 (9th Cir. 2001). It is the government's burden to

25  demonstrate that its agents complied with the Fourth Amendment. See id.

26        **IV.**

27  **THIS COURT SHOULD DISMISS THE INDICTMENT BECAUSE THE GOVERNMENT**
    **DEPORTED EXCULPATORY WITNESSES**

28

1   The indictment should be dismissed because the government violated Mr. Cordova's right

2   to due process under the Fifth Amendment and to compulsory due process under the Sixth Amendment when

3   it removed to Mexico other individuals encountered with Mr. Cordova. See United States v. Valenzuela-

4   Bernal, 458 U.S. 858 (1982); see also United States v. Mendez-Rodriguez, 450 F.2d 1 (9th Cir. 1971)

5   (government may not deport witnesses who might help the defense); United States v. Gamez-Orduno, 235

6   F.3d 453, 461 (9th Cir. 2000) ("The suppression of material evidence helpful to the accused, whether at trial

7   or on a motion to suppress, violates due process if there is a reasonable probability that, had the evidence been

8   disclosed, the result of the proceeding would have been different.)

9   **A.     The Indictment must Be Dismissed Because the Government Failed to Make a Good Faith**
    **     Determination as to Whether Any of the Other Witnesses Apprehended with Mr. Cordova**
10  **     Possessed Material and Favorable Information to the Defense.**

11  In Valenzuela-Bernal, 458 U.S. at 861, three undocumented aliens were apprehended with the

12  defendant. Following their arrest, officers interviewed the defendant and all three undocumented aliens. Id.

13  The three undocumented aliens identified the defendant as the driver. Id. The officers then contacted an

14  Assistant United States Attorney who concluded that the aliens possessed no evidence material to either the

15  prosecution or the defense. Id. Two of the three aliens were deported to Mexico. Id. The defendant was

16  charged with transporting an illegal alien. The defendant made no attempt to explain how the two people who

17  were deported could assist him in proving that he did not know that the third person, who was detained as a

18  witness, was not an illegal alien. Id.

19  The Supreme Court reaffirmed that the deportation of alien witnesses can violate the Fifth

20  Amendment right to due process as well as the Sixth Amendment right to compulsory process, but rejected

21  the Ninth Circuit's "conceivable benefit" test because it found that such a test was a virtual "per se" rule

22  which required little if any showing that the testimony of the absent witnesses would have been either

23  favorable or material. Id. at 866. Thus, the Court held that something more than the mere absence of

24  testimony is necessary to establish a violation of the Fifth and Sixth Amendments. Id. at 872 (discussing Fifth

25  Amendment right); id. at 867 (discussing Sixth Amendment right). Specifically, the defendant must at least

26  make a plausible showing of how the missing witnesses' testimony would have been both material and

27  favorable to his defense. Id. at 867.

28  However, the Court noted that because prompt deportation deprives the defendant of an opportunity

to interview the witnesses, "the defendant cannot be expected to render a detailed description of their lost testimony." Id. at 873. The Court further noted that the fact that a defendant has no opportunity to interview the deported witnesses may also support a relaxation of the materiality requirement. See id. at 870. "[T]he events to which a witness might testify, and the relevance of those events to the crime charged, may well demonstrate either the presence or absence of the required materiality." Id. at 871.

Important to the holding in Valenzuela-Bernal was the fact that the government interviewed all of the witnesses prior to deporting them. Thus, the Court noted that "the prompt deportation of alien witnesses who are determined by the Government to possess no material evidence relevant to a criminal trial is justified by several practical considerations." Id. at 865. Implicit in this statement is the duty of the government to first make a good faith determination that the alien witnesses possess no evidence favorable to the defense before removing them.

In contrast, here, the government failed to interview the alien witnesses regarding what if any information they had regarding the allegations against Mr. Cordova and specifically, what information they had about the stop of the vehicle Mr. Cordova was driving. The government's lack of good faith, or in other words, bad faith is apparent from the facts. Unlike the agents in Valenzuela-Bernal, it appears that the agents here failed to interview the witnesses to determine whether they had any information material to the validity of the stop

The government must prove that any waiver of his right to retain witnesses is knowing and intelligent. See United States v. Lujan-Castro, 602 F.2d 877, 878-79 (9th Cir. 1979) (reaffirming the significance of the right to retain deportable alien witnesses as established in Mendez-Rodriguez, but holding that such right could be waived, so long as any such waiver was made knowingly and intelligently).

Where, as here, the government apparently failed to interview the witnesses before removing them to Mexico in order to make any good faith determination whether the witnesses possessed evidence favorable to the defense, the requirement under Valenzuela-Bernal that the defendant present a plausible theory as to how the testimony of the deported witnesses would be both material and favorable to the defense should not apply. See Valenzuela-Bernal, 458 U.S. at 867 (explaining that defendant must make a plausible showing of how the deported witnesses' testimony would have been material and favorable to the defense). However, if this Court finds that it does apply, Mr. Cordova believes the material witnesses would testify that he was

1 driving the speed limit, obeying the traffic laws and that he stopped when he was pulled over.

2 **B.    The Court Should Hold an Evidentiary Hearing to Determine Whether the Deported
3    Witnesses Were Interviewed and What Information Was Obtained from them Prior to Their
    Removal.**

4        The government has the obligation to provide a defendant with all exculpatory evidence within its

5 control.  See Brady v. Maryland, 373 U.S. 83, 87 (1963); see also Gamez-Orduno, 235 F.3d at 461.  The

6 government should not be able to avoid its obligation under Brady by destroying exculpatory evidence before

7 the defendant has the opportunity to preserve it for trial.  For that reason, a showing of bad faith is not required

8 where the government removes people it knows can provide exculpatory evidence.  Cf. United States v. Dring,

9 930 F.2d 687 (9th Cir. 1991) (no one knew what witnesses would have said); Mendez-Rodriguez, 450 F.2d

10 1 (same); Valenzuela-Bernal, 458 U.S. 858 (same).

11        As Judge Kozinski explained in his dissent in United States v. Ramirez-Lopez, 315 F.3d 1143, 1165

12 (9th Cir. 2003) (withdrawn), the bad faith requirement only applies "to innocent removal of aliens by the

13 government." Id.  "Cases where the government removes aliens it knows can provide exculpatory evidence

14 are analyzed pursuant to the standard developed in Brady, and in such cases-let's all say it together-'the

15 question of bad faith [is] irrelevant." Id.; see also Dring, 930 F.2d at 693, n. 7 (explaining that the bad faith

16 requirement does not apply where the government fails to disclose evidence which it knew to be exculpatory).

17 Thus, if the defendant's assumption that the agents did not interview the witnesses is wrong, and the witnesses

18 did in fact advise the agents that the vehicle did not fail to yield or that they saw no lights or heard no sirens,

19 dismissal would be appropriate even absent a showing of bad faith.  Therefore, this Court should hold an

20 evidentiary hearing to determine whether any of the agents knew that the deported aliens could testify in Mr.

21 Cordova's favor.  If any of the agents knew that the witnesses had such information, the indictment must be

22 dismissed regardless of whether the government acted in "bad faith."

23 **D.    Conclusion**

24        The Court should dismiss the indictment under the Fifth Amendment due process clause and the

25 Sixth Amendment compulsory process clause because: 1) the government failed to make a good faith

26 determination as to whether the alien witnesses possessed material evidence favorable to the defense, 2) the

27 government voluntarily returned to Mexico people without questioning them regarding the circumstances of

28 the stop and without obtaining contact information for them sufficient to enable defense counsel to locate

them in Mexico, and 3) Mr. Cordova has made a plausible showing that the witnesses possessed material evidence favorable to the defense. Alternatively, if the Court declines to the dismiss the indictment outright, Mr. Cordova respectfully requests an evidentiary hearing on the matter.

**V.**

**THE COURT SHOULD SUPPRESS MR. CORDOVA'S ALLEGED STATEMENTS**

**A.    _Miranda_ Warnings Must Precede Custodial Interrogation.**

The Supreme Court has held that the government may <u>not</u> use statements, whether exculpatory or inculpatory, obtained during custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. <u>Miranda v. Arizona</u>, 384 U.S. 436, 444 (1966). The law imposes no substantive duty upon the accused to make any showing other than that the statements were taken while the accused was in custody and subject to interrogation. <u>Id.</u> at 476. Custodial interrogation is questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of her freedom of action in any significant way. <u>Id.</u> at 477; <u>see also</u> <u>Orozco v. Texas</u>, 394 U.S. 324, 327 (1969). In <u>Stansbury v. California</u>, 511 U.S. 318 (1994), the Court stated, "the initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." <u>Id.</u> at 323.

When it takes an accused's statement during custodial interrogation, a heavy burden rests on the government to demonstrate that the accused intelligently and voluntarily waived his privilege against self-incrimination. To satisfy this burden, the prosecution must introduce evidence sufficient to establish "that under the 'totality of the circumstances,' the defendant was aware of 'the nature of the right being abandoned and the consequences of the decision to abandon it." <u>United States v. Garibay</u>, 143 F.3d 534, 536 (9th Cir. 1998) (quoting <u>Moran v. Burbine</u>, 475 U.S. 412, 421 (1986)). The Ninth Circuit has stated that "[t]here is a presumption against waiver." <u>Garibay</u>, 143 F.3d at 536. The standard of proof for a waiver of constitutional rights is high. <u>Miranda</u>, 384 U.S. at 475; <u>see also</u> <u>United States v. Heldt</u>, 745 F.2d 1275, 1277 (9th Cir. 1984) (the burden on the government is great, the court must indulge every reasonable presumption against waiver of fundamental constitutional rights) (citing <u>Johnson v. Zerbst</u>, 304 US 458, 464 (1938)). Finally, it should be noted that, since <u>Miranda</u> rests on a constitutional foundation, <u>see</u> <u>Dickerson v. United States</u>, 530 U.S. 428, 438 (2000), no law or local court rule relieves the government of its burden to prove that Mr. Cordova

1  voluntarily waived the Miranda protections.  Miranda, 384 U.S. at 475.

2       The validity of the waiver depends upon the particular facts and circumstances of the case, and

3  include the background, experience, and conduct of the accused.  Edwards v. Arizona, 451 U.S. 477, 482

4  (1981); Johnson v. Zerbst, 304 U.S. 458, 464 (1938); see also Garibay, 143 F.3d at 536; United States v.

5  Bernard S., 795 F.2d at 751 ("a valid waiver of Miranda rights depends upon the totality of the circumstances,

6  including the background, experience and conduct of the accused").  In Derrick v. Peterson, 924 F.2d 813 (9th

7  Cir. 1990), the Ninth Circuit confirmed that the issue of the validity of a Miranda waiver requires a two prong

8  analysis: the waiver must be both (1) voluntary; and, (2) knowing and intelligent.  Id. at 820.  The

9  voluntariness prong of this analysis "is equivalent to the voluntariness inquiry [under] the [Fifth] Amendment

10  . . . ."  Id.  The knowledge prong mandates an inquiry into whether "the waiver [was] made with a full

11  awareness both of the nature of the right being abandoned and the consequences of the decision to abandon

12  it."  Id. (quoting Moran v. Burbine, 475 U.S. 412, 421 (1986)); accord Garibay, 143 F.3d at 436.  Thus,

13  "[o]nly if the 'totality of the circumstances surrounding the interrogation' reveal both an uncoerced choice

14  and the requisite level of comprehension may a court properly conclude that the Miranda rights have been

15  waived."  Derrick at 820 (quoting Moran v. Burbine, 475 U.S. at 521) (emphasis in original) (citations

16  omitted)).

17       Here, Mr. Cordova was in custody once he was stopped in his car.  Unless and until it shows the

18  agents properly administered the Miranda warnings and obtained a knowing and intelligent waiver from Mr.

19  Cordova, the government cannot use evidence obtained as a result of any custodial interrogation that occurred

20  after Mr. Cordova's arrest.  Miranda, 384 U.S. at 479.

21  //

     **B.    The Government Bears the Burden of Proving that Mr. Cordova's Alleged Statements**
22          **Were Made Voluntarily**

23       Even when the procedural safeguards of Miranda have been satisfied, a defendant in a criminal case

24  is deprived of due process of law if his conviction is founded upon an involuntary confession.  Arizona v.

25  Fulminante, 499 U.S. 279 (1991); Jackson v. Denno, 378 U.S. 368, 387 (1964).  The government bears the

26  burden of proving that a confession is voluntary.  Lego v. Twomey, 404 U.S. 477, 483 (1972).

27       In order to be voluntary, a statement must be the product of a rational intellect and free will.

28  Blackburn v. Alabama, 361 U.S. 199, 208 (1960).  In determining whether a defendant's will was overborne

1  in a particular case, this Court must consider the totality of the circumstances.  Schneckloth at 226; see also

2  United States v. Bautista-Avila, 6 F.3d 1360, 1364 (9th Cir. 1993).  A statement is involuntary if it is

3  "extracted by any sort of threats or violence, [or] obtained by any direct or implied promises, however slight,

4  [or] by the exertion of any improper influence."  Hutto v. Ross, 429 U.S. 28, 30 (1976) (quoting Bram v.

5  United States, 168 U.S. 532, 542-43 (1897)); see also United States v. Tingle, 658 F.2d 1332, 1335 (9th Cir.

6  1981).

7      To meet its burden, the government must demonstrate that Mr. Cordova's statement was not the

8  result of either threats or promises made by the agents, but was made voluntarily.

9  **C.**      **This Court Must Conduct An Evidentiary Hearing.**

10     Accordingly, this Court must conduct an evidentiary hearing to determine whether the government

11  can meet this burden and use Mr. Cordova's statements against him.  18 U.S.C. § 3501.  Since "'suppression

12  hearings are often as important as the trial itself,'" these findings should be supported by evidence, not merely

13  an unsubstantiated recitation of purported evidence in a prosecutor's responsive pleading.  See United States

14  v. Prieto-Villa, 910 F.2d 601, 609-10 (9th Cir. 1990) (quoting Waller v. Georgia, 467 U.S. 39, 46 (1984)).

15     Unless and until the government demonstrates that statements were made voluntarily, the statements

16  may not be used for any purpose at trial.

**VII.**

**MOTION FOR LEAVE TO FILE FURTHER MOTIONS**

19     Mr. Cordova requests the opportunity to file further motions and/or supplement the motions

20  already filed after reviewing additional discovery and conducting independent investigation.

**VIII.**

**CONCLUSION**

23     For the foregoing reasons, Mr. Cordova respectfully requests that the Court grant the above

24  motions.

25                                          Respectfully submitted,

26                                           /s/ Jodi Thorp
   Dated:  March 24, 2008                   **JODI THORP**
27                                          Counsel for Mr. Cordova

28